# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | : Criminal Action No. 22-cr-01-CFC |
| JAMES PICKETT, | : |
| Defendant. | : |

## DEFENDANT'S SENTENCING MEMORANDUM[1]

James had just turned twenty-three years old when he was arrested and charged in this case. In his short life he has been the victim of CSAM production and now twice a convicted possessor of such material. The circumstances of his life are as concerning as they are unique. This court is now presented with a challenge that the parties have wrestled with for the past two years: how did James get here and how can he turn his life around? Unlike many possessors of CSAM, James is still quite young and therefore has the majority of his life ahead of him, despite the mandatory ten-year sentence that he faces.

---

[1] As always, the defense has filed an Attachment A under seal for the court's review.

The parties jointly and respectfully recommend that this court impose a sentence of one hundred twenty (120) months, ten years of supervised release, and a $100 special assessment fee as appropriate punishment. This sentence serves the interests of justice and is sufficient, but not greater than necessary, to satisfy the purposes of sentencing as set forth at 18 U.S.C. § 3553(a). This suggested sentence considers James's history and characteristics and the nature and circumstances of his criminal conduct.

I. BACKGROUND AND MENTAL HEALTH

James was raised online, in his mother's home while she worked. His father was incarcerated for a series of fraud convictions for much of his life and had next to no influence during his formative years. When not working, his mother was buried by her own struggles that often spilled over into their home. Her love was a tumultuous force, alternating between moments of fleeting warmth and prolonged spells of emotional and physical abuse. The swiftness with which she could go from seemingly stable to livid scared James and he learned to bottle up his emotions as a result. He was shy and socially awkward and never formed friendships as a child. At a young age he began to spend increasing amounts of time online.[2]

---

[2] *See* Exhibit A – Psychological/Psychosexual evaluation of James Pickett by Dr. Thomas Haworth at 2-5.

James's Aunt Tinqua, his mother's younger sister, stated when interviewed that when James's mother became pregnant at age twenty-four years old her immediate reaction was that her sister was not fit to be a parent and should not have a child with a man who was on his way to federal prison. Tinqua no longer speaks to her sister, Tiayokashima, James's mother. The first two years of James's life left such a mark on the sisters that their relationship was forever fractured. Tinqua cared for James and his twin brother in New York while Tiayokashima ran the streets. When New York child protective services were called, Tiayokashima felt her sister called them on her. Tinqua believes a neighbor called child protective services on the twins because they were in the house by themselves. To this day, the sisters still do not speak.

Tinqua recounted that she and Tiayokashima were raised in a dysfunctional household with deep-rooted issues. Their father was an alcoholic and their mother was emotionally and verbally abusive. Tinqua was in foster care with a family from age six through twelve. She described her upbringing as being raised by wolves. She was molested at eight years old and started reading romance novels at twelve years old. Tinqua stated she was diagnosed with bipolar and anxiety. She said she is happy to say she is healing from their childhood and getting therapy. However, Tiayokashima

never believed in therapy, so she would not get it for herself and would later eschew recommendations that James be counseled. In describing her sister's relationship with James and his brother she said Tiayokashima would take the twin's disability and social security check and use it for rent or personal needs, rather than on the necessities of James and his brother.

Both James and his twin, Davin, were born at thirty-four weeks, weighing four pounds, thirteen ounces. They did not start talking until they were four years old. Tiayokashima recounts that she would ask the twins questions, and they would not respond, only stare. She said it was a struggle with them not expressing any language.

Tiayokashima lived in Section 8 housing for majority of James's life, while qualifying for Women, Infant, and Children (WIC) funding for James, his twin brother, and her other children. According to Christiana School District records, James was moved from school to school by his mother. He attended Pre-Kindergarten at Brader Elementary; Kindergarten and first grade (repeated) at Brookside Elementary; second grade at West Park Place Elementary; third and fourth grade at Brookside Elementary; fifth grade (repeated) at Smith Elementary; and sixth grade (repeated) at Prestige Academy Charter School.

James began receiving special education services and several psychotherapy sessions at Nemours Childrens Hospital before he completed grade school.[3] His intellectual comprehension scores at an early age suggest low intellectual function:

> 2009 (Age 12) psychoeducational evaluation assessment data (WISC-IV 2009)[4]
> - Verbal Comprehension    69 (Extremely Low)
> - Perceptual Reasoning    96 (Average)
> - Working Memory          74 (Borderline)
> - Processing Speed        75 (Borderline)
> - Full Scale IQ           73 (Borderline)

From age seven to age fourteen, as his intellectual disability became more clear, Tiayokashima would regularly hit James with a belt on his back where he would be severely bruised. When he was at Brookside Elementary School, a teacher questioned him about a scar on his leg from the belt buckle. When he was twelve, James took an interest in camping and did a bit of research online. He went outside and began to try to make a campfire. His mother saw smoke on the side of the building, pulled him into the house, looked him in the eye and said, "you like to play with fire?" and then lit his shirt on fire.

---

[3] *See* Exhibit B - Psychoeducational Evaluation, October 12 and 15, 2015, by Amy Lowe, M.Ed., NCSP
[4] *See* Exhibit C – Psychological Evaluation, May 18, 2009, AI DuPont Nemours Hospital for AIDHC in the Division of Behavioral Health.

His mother verbally abused him on a daily basis, and if she did not like something he did, he would have to do push-ups until failure. As James grew older, he discovered a truth about himself that added another layer to his complex journey, he was bisexual. The fear of rejection from his mother made him feel even more isolated in his volatile home life. He started to look at guys from age thirteen. When he was fourteen, James first had thoughts of self-harm and behaviors of recklessness or self-injury with no suicidal desire, plan, or intent.[5] He started by cutting, picking scabs open until they bled, and punching walls. He indicated that self-harm served as an outlet during periods of distress. He reported thinking about dying "off and on" throughout most of his life since age fourteen. In James's words, *"I didn't have friends growing up. I had trust issues with adults, which made it hard to explain anything."*

James was creative, and kind-hearted, but he carried a deep yearning in his heart. He was bisexual and he longed for the acceptance of his mother and presence of his father in his life. Growing up, James had sensed a distance between himself and his mother. At the same time, not having his father in his life left him feeling a sense of emptiness while he navigated school and home life. Tiayokashima struggled to understand and come to

---

[5] *See* Exhibit D - FDC records received June 9, 2023, at 13 – notes from May 23, 2023, session with Psychologist Rebecca Huseman.

terms with James's sexuality. The tension grew as the years passed, and the unspoken divide became increasingly apparent.

As James turned into a young teen, he found his social circle in the online world. His only in-person age related contact was with this brother, Devin. In an interview with Davin Pickett in November 2023 he told an investigator with the Federal Public Defender's Office that he had just returned from Behavioral Health, where he was on suicide watch. A friend took him there after seeing a post he put up on social media stating his intention to take his life. Davin said this was due to his home life with his mother.

Davin stated *"My mother was always angry, still until this day. James and I would be punished or yelled at for not cleaning the house. Growing up we were physically abused. We did not go outside too much just Xbox or on the computer. We had no human contact with other people. Our mother does not explain herself. In the house, we were never able to express or say anything. It makes it hard now to communicate with other people. I do not know how to explain myself. I shutdown. Mom has so much anger issues. James and I talked about getting a place together away from her."*

By 2012 James was fifteen years old and still in seventh grade. His classmates were all twelve years old. One day, the police came to James's

7

house and spoke with his mother. They explained that he was detected for involvement with child pornography. They also reportedly came to his school and interviewed him. He was unsure of why, but the investigation was closed. It does not appear that his mother took any action to address this report.

On November 20, 2015, James was taken to Christiana Care by police from school. James made suicidal statements to a friend. He reported the night before he had suicidal ideation because of things going on at home. Rockford records state "Patient told the classmate that he wanted to jump off the bridge on Old Baltimore Pike, run into traffic, or hang himself." His friend reported it, and James was taken to Rockford and was inpatient from November 20th to 25th, 2015. The reason for admission – "*I disappoint my mother and I messed up all the time.*" The report notes that James has a learning disability, issue with sexual orientation, depression, suicidal ideation, and plans to jump from the bridge.[6]

When James was incarcerated in the Department of Corrections in 2016, he was diagnosed as having intellectual disabilities, Bipolar Type II, PTSD, Persistent Depressive Disorder and Major Depressive Disorder.

---

[6] *See* Exhibit E – Rockford Center Records

Since arriving at the Federal Detention Center in Philadelphia ("FDC") James has been placed as a Care-MH inmate and reported seeing Dr. Rebecca Huesman on a weekly basis in the RISE unit. He also participated in group and individual therapy. On September 12, 2022, FDC records stated James tied a sheet around his left wrist as "self-punishment." On September 30, 2022, FDC records diagnose James as a Care3-MH[7] Inmate with Major Depressive Disorder, Moderate, Recurrent Episode, and posttraumatic stress disorder. He was prescribed Sertraline and Trazodone. James was also placed on the RISE unit and engaged in DBT groups and individual therapy.

## II. GUIDELINES

The PSR properly sets the sentencing guidelines at one hundred twenty to one hundred thirty-five (120-135) months. **PSR ¶ 161.** For the

---

[7] Federal Bureau of Prisons Clinical Guidance – May 2019 - Care Level Classification for Medical and Mental Health Conditions or Disabilities Pamphlet: Federal Bureau of Prisons Care Level Classification Clinical Practice Guidance May 2019 - Care Level 3 inmates are outpatients who have complex, and usually chronic, medical, or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications. They may require assistance with some activities of daily living (ADLs) that can be accomplished by inmate companions. Stabilization of medical or mental health conditions may require periodic hospitalization.

reasons set forth herein a sentence of one hundred twenty (120) months is appropriate.

### III. 3553(a) SENTENCING FACTORS

James's repeated and apparently compulsive viewing of CSAM is concerning but must be contextualized in his long history of neurodiversity and emotional and physical trauma. He has come to use viewing CSAM material as a safe space to escape from a life that he often finds unmanageable. Dr. Haworth concluded that he "appears to have honed a pathway to offending which is likely more related to the neurologically based deficits of the Autism Spectrum than deviant sexual arousal."[8] Sentencing such an individual creates a paradox for the court: the treatment that he needs can only effectively be delivered in a real world scenario, where he must confront the stresses of real life and learn to cope without engaging in criminality, but he has also demonstrated that he may not yet have the basic tools necessary to avoid re-offending in the short term while he receives the necessary treatment and counseling. Here, a jail term is clearly necessary, but the length of that term need not exceed the statutory mandated ten years. Indeed, there is no logical basis for imposition of a longer term of incarceration.

---

[8] Exhibit A at 14.

What is needed is a longer term of supervised release, than the statutory prescribed five years, and one that involves both intensive supervision and access to the significant resources that James needs. Had James's numerous challenges not been neglected for so long he likely may not have ended up here. With such a long life ahead of him, this sentencing serves as a true opportunity to turn the tide from compulsive criminality to a healthier existence.

IV. <u>CONCLUSION</u>

For the foregoing reasons it is respectfully requested that this court impose a sentence of one hundred twenty (120) months and a period of ten years supervised release with further conditions of release to be fashioned by the court at the time of sentencing.

                                                Respectfully submitted,

                                                ELENI KOUSOULIS
                                                Federal Public Defender

Dated: <u>March 22, 2024</u>          /s/ *Conor Wilson*
                                                CONOR WILSON, ESQ.
                                                Assistant Federal Public Defender
                                                800 King Street, Suite 200
                                                Wilmington, DE 19801
                                                (302) 573-6010
                                                de_ecf@fd.org

                                                Attorneys for James Pickett